FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT
APR 26 2012
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** <br> **Plaintiff,** <br> **v.** <br> **VICTOR MANUEL VILLAR,** <br> **Defendant.** | **CR 08-01104(A)-CJC** <br> **MEMORANDUM OF DECISION** |

## I. INTRODUCTION AND BACKGROUND

The United States of America (the "Government") charged Defendant Victor Manuel Villar with Count One (conspiracy to distribute a controlled substance), Count Ten (use of a communication facility), and Count Sixteen (criminal forfeiture) in the First Superseding Indictment (the "Indictment"), filed on April 8, 2009. (Dkt. No. 49.) The charges against Mr. Villar are part of a seventeen-count, eighty-page indictment charging a total of twenty defendants with various crimes arising from their alleged involvement in a conspiracy with each other, the members and associates of the Varrio Hawaiian

Gardens Gang (the "VHG Drug Traffickers"),[1] and others, to distribute large quantities of methamphetamine from an unknown date to approximately April 2009 in Los Angeles County and elsewhere.[2] Mr. Villar's case was severed from the cases of the other defendants.[3] The Government proceeded on Counts One and Ten against Mr. Villar and moved to dismiss Count Sixteen against Mr. Villar prior to trial.

Specifically, under Count One, the Government charged Mr. Villar with conspiracy to distribute at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine, or at least 50 grams of actual methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). (Indictment, at 7 ¶ 2.)[4] The Government alleges that beginning on an unknown date and continuing until approximately April 2009, Mr. Villar conspired with defendants Arnulfo Vasquez Barajas, also known as ("aka") Fernando Lopez Jimenez, aka Leo ("Leo") and Alejandro Dominguez-Gomez, aka Alex ("Alex"), as well as others to distribute methamphetamine. (*Id.* at 2–4 ¶¶ 1, 2.) The Government alleges that Mr. Villar would obtain methamphetamine from Leo, the supplier, and resell the drug to third-party customers. (*Id.* at 10 ¶ 14.) In furtherance of the conspiracy to distribute

---

[1] The Indictment alleges that the VHG Drug Traffickers controlled all drug trafficking in and around the City of Hawaiian Gardens, California. (Indictment, at 4 ¶ 2.) The allegations related to the VHG Drug Traffickers, however, are not material to the charges against Mr. Villar.

[2] The Government submitted a redacted version of the First Superseding Indictment with respect to the charges against Mr. Villar, which omits the counts with which Mr. Villar was not charged as well as the objects of the conspiracy and overt acts that do not directly involve Mr. Villar under Count One.

[3] The following arraigned defendants have pleaded guilty: Guillermo Herrera, Olga Lidia Flores, Martin Verduzco-Villanueva, Armando Guzman Garcia, Gerardo Garfias, and Raymond Cardenas.

[4] In the Indictment, the Government charged Mr. Villar with the conspiracy to distribute *and* to possess with intent to distribute methamphetamine. (Indictment, at 4 ¶ 2.) However, the Government litigated the case against Mr. Villar on the charge to distribute methamphetamine and admitted during closing arguments that it was not necessary to reach the charge of possession with intent to distribute in this case. (Tr. 67:16–24, Jan. 19, 2012.) The Court thus focuses solely on the charge against Mr. Villar for conspiracy to distribute methamphetamine under Count One.

methamphetamine, the Government alleges that Mr. Villar participated in various telephone conversations from March to June 2006, in which Mr. Villar used coded language with others to obtain methamphetamine from Leo and sell the drug to his customers. (*Id.* at 14–38 ¶¶ 9, 13, 19–20, 68, 99–104, 106–109, 130–31, 148–49.) Under Count Ten, the Government charged that on or about May 1, 2006, Mr. Villar knowingly and intentionally used a telephone in furtherance of a conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 843(b). (*Id.* at 71.)

The Court conducted a three-day bench trial in this matter from January 17 to January 19, 2012. The Government presented the testimony of eight witnesses in its case in chief as well English translations of intercepted phone conversations, which were conducted primarily in Spanish, involving Mr. Villar and others to further their alleged conspiracy to distribute methamphetamine. Mr. Villar proceeded *in propria persona* for part of this case and the entirety of the trial. Mr. Villar's defense is that the drug at issue was not methamphetamine, but cocaine, and that he was pressured into relaying messages from Leo to third parties related to the purchase of cocaine. After considering all the evidence and arguments presented at trial, the Court finds Mr. Villar guilty on both Count One for conspiracy to distribute a controlled substance, specifically methamphetamine, and Count Ten for use of a communication facility in furtherance of a conspiracy to distribute methamphetamine. The Court separately finds that Mr. Villar conspired to distribute at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine.[5]

///

///

[5] After trial, on January 23, 2012, Mr. Villar submitted a motion to dismiss the Indictment for insufficient evidence. The Court DENIES that motion, as the Court finds that the Indictment was sufficiently pled, and the Government presented overwhelming evidence of Mr. Villar's guilt at trial.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Count One – Conspiracy to Distribute Methamphetamine (21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A))

The Government charged Mr. Villar with conspiracy to distribute at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine, or at least 50 grams of actual methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). (Indictment, at 7 ¶ 2.)

#### 1. Legal Standard

Section 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846. To prove the elements of conspiracy to distribute a controlled substance, the Government must show beyond a reasonable doubt that (1) during a certain time period, "there was an agreement between two or more persons" to distribute the controlled substance; and (2) "the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose." Ninth Circuit Manuel of Model Jury Instructions – Criminal Instr. 9.19 (2010) (hereinafter "Crim. Instr."); *see also United States v. Reed*, 575 F.3d 900, 923 (9th Cir. 2009) ("To establish a drug conspiracy, the government must prove (1) an agreement to accomplish an illegal objective; and (2) the intent to commit the underlying offense." (citations and quotes omitted)). The crime of conspiracy consists of "agreement to do something unlawful"; however, "it does not matter whether the crime agreed upon was committed." Crim. Instr. 9.19; *see also United States v. Shabani*, 513 U.S. 10, 15 (1994) (holding that "to establish a violation of 21 U.S.C. § 846, the Government need not prove the commission of any overt acts in furtherance of the conspiracy").

An agreement for the purpose of finding a conspiracy does not require that "the conspirators made a formal agreement or that they agreed on every detail of the conspiracy"; nevertheless, it is not enough "that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another." Crim. Instr. 9.19. Rather, a finding of conspiracy necessitates "that there was a plan to commit at least one of the crimes alleged in the indictment as an object of purpose of the conspiracy." *Id.* "One becomes a member of the conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy." *Id.* A person does not become a conspirator, however, if the person "has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy." *Id.* Nor does a person become a conspirator "merely by associating with one or more persons who are conspirators" or by merely "knowing that a conspiracy exists." *Id.*

Here, the alleged object of Mr. Villar's conspiracy is to distribute a controlled substance—specifically, methamphetamine—in violation of 21 U.S.C. § 841(a)(1), which provides that "it shall be unlawful for any person knowingly or intentionally – (1) to manufacture, distribute or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ." To be guilty of distributing a controlled substance entails (1) knowingly distributing a certain controlled substance and (2) knowledge that it was a certain controlled substance or "some other prohibited drug." *See* Crim. Instr. 9.18; *see also United States v. Houston*, 406 F.3d 1121, 1122 n.2 (9th Cir.) (approving a similar instruction for the requirements under 21 U.S.C. § 841(a)(1)), *cert. denied*, 546 U.S. 914 (2005). Distributing a controlled substance means "delivering or transferring possession" of the controlled substance "to another person, with or without any financial interest in that transaction." Crim. Instr. 9.18; *see also* Crim. Instr. 9.19.

As applied to Mr. Villar, to show that Mr. Villar is guilty of conspiracy to distribute methamphetamine, the Government must prove beyond a reasonable doubt that (1) during a certain time period, there was an agreement, *i.e.*, a plan involving two or more persons to knowingly deliver or transfer methamphetamine to another person, with or without any financial interest in that transaction, with knowledge that it was methamphetamine or some prohibited drug; and (2) Mr. Villar willfully participated in the plan to distribute methamphetamine with the intent to further the plan. However, the Government need not show that the distribution of methamphetamine actually occurred. The Government also need not prove the amount or quantity of methamphetamine to be distributed, only that "there was a measurable or detectable amount" of the drug. Crim. Instr. 9.18. Here, the Government separately sought to prove that Mr. Villar conspired to distribute at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine, or in the alternative, at least 50 grams of actual methamphetamine. If the Government succeeds in proving either of these amounts of methamphetamine, then pursuant to 21 U.S.C. § 841(b)(1)(A), the Court must sentence Mr. Villar to a term of imprisonment of not less than 10 years, subject to any applicable safety valve provision.

**2. Mr. Villar's Conspiracy to Distribute Methamphetamine**

The Government has shown beyond a reasonable doubt that Mr. Villar willfully participated in a plan with others to distribute methamphetamine with the intent to further that plan in violation of 21 U.S.C. §§ 846 and 841(a)(1). The Government has also separately shown beyond a reasonable doubt that Mr. Villar is guilty of conspiracy to distribute at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine and is thus subject to the penalty provision under 21 U.S.C. § 841(b)(1)(A). The evidence presented to the Court, including the testimony of Mr. Villar and eight witnesses, as well as eighteen transcripts of court-authorized intercepted telephone calls (Govt.'s Exhs. 8–23, 36–37), establish that Mr. Villar willfully

participated in a plan with Leo, the supplier of methamphetamine, Leo's drug runner Alex, and others to obtain methamphetamine and transfer possession of methamphetamine to Villar's customers with the intent to further the plan to distribute methamphetamine, as early as March 11, 2006 and ending no later than June 9, 2006. In essence, Villar knowingly and deliberately acted as a middle-man or broker of methamphetamine between Leo and third-party purchasers of the drug.

The Government provided overwhelming evidence that there was a criminal partnership involving two or more people (Leo, Alex, Mr. Herrera, and others) to distribute methamphetamine from approximately mid-2006 to around April 2009. Detective Jeffrey Bosket, the narcotics detective at the Los Angeles City Sheriff's Department, who was the primary case agent responsible for overseeing an investigation called Operation Knock Out involving the Hawaiian Gardens Gang ("Hawaiian Gardens case") since 2005, was designated as an expert to testify on behalf of the Government on the structure of drug trafficking organizations ("DTOs"), wiretap investigations, the price of methamphetamine in 2006, and to help interpret code language in the transcripts of the intercepted phone conversations. (Tr. 98:18–23, Jan. 17, 2012.) In connection with the Hawaiian Gardens case, Mr. Bosket obtained wiretap orders from the Honorable Gary A. Feess of the Central District of California authorizing interceptions of calls over cellular phones subscribed by various members of the alleged conspiracy to distribute methamphetamine, including Mr. Herrera, at the numbers (626) 274-9284 and (626) 475-7618 (activated on June 1, 2005), which Mr. Bosket testified were used by Leo. (Tr. 102:5–21, Jan. 17, 2012; Govt.'s Exhs. 1 & 2B [Herrera Phone Subscription Info.], 26 [Mar. 8, 2006 Wiretap Order], 27 [Apr. 24, 2006 Wiretap Order], 28 [June 5, 2006 Wiretap Order].) Detective Bosket also oversaw the monitoring of live audio calls for three and a half years and listened to hundreds of intercepted phone conversations involving Leo and others. (Tr. 98:25–99:12, 117:12–14, Jan. 17, 2012.) Approximately 212 defendants were indicted in connection with the Hawaiian Gardens case. (Tr. 99:13–

17, Jan. 17, 2012.) Detective Bosket learned that Leo was a Mexican national who lived inside the Hawaiian Gardens area and supplied methamphetamine to many of the Hawaiian Gardens gang members. (Tr. 102:5–11, Jan. 17, 2012.) Through intercepted calls, Detective Bosket also learned that Leo was involved in a scheme with Mr. Herrera, Alex, and others, in which Mr. Herrera received narcotics from Mexico at his residence on behalf of Leo, who would send his runner (usually Alex) to pick up the drug from Mr. Herrera's residence, after which Leo would give Mr. Herrera cash to send down to Mexico. (Tr. 117:15–25, 118:1–11, Jan. 17, 2012.) Leo would also arrange a courier to deliver drugs to customers and collect payment from them. (Tr. 118:10–14, Jan. 17, 2012.)

[redacted] Mr. Bosket also testified that from his investigation of the Hawaiian Gardens case, he only knew Leo to sell methamphetamine. (Tr. 147:8–11, Jan. 17, 2012.) Mr. Villar further testified that towards the end of 2004, he witnessed Leo's arrest, and that he believed Leo to be engaged in drug trafficking. (Tr. 6:15–7:21, Jan. 19, 2012.)

The Government further submitted English translations[6] of intercepted phone calls involving Leo and others, including Mr. Villar, in which they arrange to supply, broker, and/or deliver methamphetamine. In the intercepted phone conversations, the participants reference methamphetamine using various slang and coded language in terms of price ("nine and a half" or "ten-five," meaning $9,500 or $10,500 for one pound of methamphetamine); adjectives "loose," "wholesome," "cut," "very ugly," "too brown," "white," and "with spikes"; and gendered descriptives such as "the bitch," "the bitch is very pretty," "this one is a lot prettier," or "some pretty trucks arrived." (*See* Govt.'s Exhs. 8–23, 36–37; Tr. 129:1–20, 137:11–138:1, 139:20–141:17, 142:22–143:24, 145:1–12, 146:23–147:11, 160:21–161:19, Jan. 17, 2012.) [redacted] The Court further heard testimony from Special Agent Craig Hammer from the Bureau of Narcotics Enforcement who was designated as an expert to testify on behalf of the Government to the price of methamphetamine in 2006 and methamphetamine production generally. (Tr. 136:16–20, Jan. 18, 2012.) Agent Hammer testified that some of the terms and price quotes

---

[6] The translations of the intercepted calls from Spanish to English were finalized by Juan Lemus, who is employed by the Metropolitan Interpreters and Translators contracted by the Drug Enforcement Administration as the site supervisor for the High Intensity Drug Trafficking Area ("HIDTA") for fourteen years, and who also worked as the site supervisor and monitor for a part of the Hawaiian Gardens case. (Tr. 39:7–18, 43:20–45:7, Jan. 17, 2012.) Mr. Lemus was designated as an expert on the subject matter of voice identification and the translation of wiretap calls from Spanish to English on behalf of the Government. (Tr. 43:14–18, Jan. 17, 2012.)

referenced in the intercepted calls are used in connection with methamphetamine. (Tr. 138:2–140:7, 150:2–9, 165:1–10, Jan. 18, 2012.)

The Government also proved beyond a reasonable doubt that Mr. Villar willfully participated in and intentionally furthered the plan involving Leo and others to distribute methamphetamine to third parties. Specifically, the Government proffered English translations of three groups of intercepted calls on Leo's and Alex's phone to and from Mr. Villar on his cellular phone number (626) 705-7450 and his mother's phone number (626) 960-8286,[7] between March and June 2006, showing that Mr. Villar acted as a broker between Leo and third-party customers by helping negotiate the price and delivery of methamphetamine. The parties do not dispute that Leo, Alex, and Mr. Villar participated in the intercepted phone conversations.

First, in three phone conversations from March 11 to March 15, 2006, Mr. Villar speaks with Leo regarding a "buddy" of Mr. Villar who is interested in purchasing methamphetamine, and Leo tells Mr. Villar to "tell him [Mr. Villar's buddy] that [he's] getting them now more expensive, at nine and a half for him." (Govt.'s Exhs. 8 [Call No. 242, Mar. 11, 2006]; 9 [Call No. 520, Mar. 13, 2007].) Mr. Bosket testified that in 2006, most methamphetamine was being sold at a pound for between $8,000 and $12,000 and that "nine and a half" means that Leo is selling a pound of methamphetamine for $9,500. (Tr. 129:1–20, Jan. 17, 2012.) Mr. Villar subsequently confirms with Leo that he will relay the price to his buddy. (Govt.'s Exh. 9.) Leo then follows up with Mr. Villar several days later and asks Mr. Villar "[w]hat happened," to which Mr. Villar states that he called his friend but he wanted to "make sure" about the price. (Govt.'s Exh. 10 [Call No. 679, Mar. 15, 2006].) Leo confirms the price, "[n]ine and half," and adds that "it has

[7] *See* Govt. Exh. 3B [Villar's Phone Subscription Info.]; Tr. 29:24–30:8, Jan. 17, 2012 [Test. of Joseph Trawicki]. Mr. Villar admitted that he used the telephone number (626) 705-7450 that was subscribed to him and that he also used his mother's phone at (626) 960-8286. (Tr. 19:6–20, Jan. 18, 2012.)

nothing to do with us, fool, that they come from down there like that." (*Id.*) Mr. Bosket testified that "down there" refers to Mexico, and that $9,500 per pound of methamphetamine was the price set by Leo's source of supply in Mexico. (Tr. 130:21–131:20, Jan. 17, 2012. [redacted] Mr. Villar then confirms that he will tell his friend and call Leo back, and Leo urges Mr. Villar "you call me back right now, because . . . there's not much love to go around," meaning that methamphetamine is getting scarce. (Govt.'s Exh. 10; Tr. 132:6–22, Jan. 17, 2012.) Mr. Villar agrees that he will call Leo. (Govt.'s Exh. 10.) The March 11 to 15, 2006 calls show that Mr. Villar was deliberately helping to arrange the sale of a pound of methamphetamine for $9,500 to a third party by relaying messages to and from Leo and his contact and agreeing to follow up with Leo about the potential sale to his customer. Here, it is irrelevant whether the sale of methamphetamine was actually consummated, only that Mr. Villar knowingly participated in the plan to deliver a pound of methamphetamine from Leo to a third party. *See* Crim. Instr. 9.19; *Shabani*, 513 U.S. at 15.

Second, during a series of four intercepted calls on May 1, 2006 involving Mr. Villar, Leo, and Alex, Mr. Villar takes a step further in the drug conspiracy by not only helping negotiate the sale of methamphetamine for a certain price but also helping set up the physical delivery of the drug to a customer at his apartment in Baldwin Park, California. Mr. Villar's phone subscription information and certified California Department of Motor Vehicle records of his driver license show that his residential address was 13623 Los Angeles Street in Baldwin Park, California, as of March 2005, July 2006, August 2006, and April 2008, which Mr. Villar does not dispute. (Govt.'s Exhs. 3B, 6 [DMV Records].) On May 1, 2006 at 6:00 p.m., Mr. Villar tells Leo that he has a "*compa*" who "wants one" and says that "I told him that at ten-five and he said yeah . . . [h]e agreed." (Govt.'s Exh. 15 [Call No. 3808].) Mr. Bosket testified that "ten-five"

means one pound of methamphetamine for $10,500. (Tr. 146:13–147:11, Jan. 17, 2012.) Leo tells Mr. Villar to tell his *compa* to "[j]ust . . . wait for [him], that I'm ready" and that Mr. Villar should "[t]ell him that in two hours and to please wait, because [he's] just arriving here to Ontario," to which Mr. Villar agrees. (Govt.'s Exh. 15.) At 10:01 p.m., Leo and Mr. Villar speak again to have Alex, Leo's runner, deliver the drug to Mr. Villar's apartment in Baldwin Park. (Govt.'s Exh. 16 [Call No. 3838].) Mr. Villar describes the location of his apartment ("Right here on – on Los Angeles and Merced . . . where the – the gasoline station, there at the Circle K."), and states that Alex can meet him and his buddy at his apartment. (*Id.*) At 10:17 p.m., Mr. Villar speaks with Alex and proceeds to give him detailed directions as Alex appears to be driving toward Mr. Villar's apartment ("O, right where the gasoline station is, if you take Merced . . . Like – you make a left there and go down towards the six, o, five . . . And passing the first light . . . A left towards the – the six, o, five. . . and passing the first light . . . There are some apartments on your right hand side . . . Make a left there on Los Angeles."). (Govt.'s Exh. 17 [Call No. 3845].) Mr. Bosket testified that he followed the route and directions described by Mr. Villar and took corroborating pictures of the landmarks referenced in the 10:17 p.m. call. (Tr. 151:7–154:5, Jan. 17, 2012; Govt.'s Exhs. 24A–24F.) Following Mr. Villar's directions, Alex states that he will be arriving at Mr. Villar's apartment in two or three minutes, to which Mr. Villar confirms "[a]ll right." (Govt.'s Exh. 17.) At 10:24 p.m., Mr. Villar and Alex talk again over the phone as Alex is coming from Los Angeles Street. (Govt.'s Exh. 18 [Call No. 3846].) Alex asks Mr. Villar where he is, and Mr. Villar answers "I'm here outside." (*Id.*) The May 1, 2006 calls demonstrate that Mr. Villar facilitated the negotiation and delivery of a pound of methamphetamine for $10,500 from Leo—via Alex—to a third-party customer by guiding Alex to his apartment and arranging to have his customer meet them at his apartment.

Third, in three intercepted calls on May 2, 2006 between Mr. Villar and Leo, Mr. Villar helps broker the sale and delivery of a half pound of methamphetamine to a third party at his residence. At 8:36 p.m., Mr. Villar tells Leo: "I talked to this guy, it's just that he says – he thought it was a little expensive, but he said he doesn't have enough right now in order to get it . . . That he would call me in case anything happened." (Govt.'s Exh. 19 [Call No. 3934].) Leo then offers that "if he wants, if he wants, I'll give it to you at about . . . ten-two *pesos*." (*Id.*) Detective Bosket testified that Leo is referring to the price of another pound of methamphetamine being $10,200. (Tr. 155:13–156:10, Jan. 17, 2012.) Mr. Villar agrees to relay the message. (Govt.'s Exh. 19.) At 8:38 p.m., Mr. Villar follows up with Leo and states: "He said that – if you can let go a half for him so that – that he could see it. That he only has enough for the half." (Govt.'s Exh. 20 [Call No. 3935].) Detective Bosket testified that "a half" refers to a half a pound of methamphetamine, and that the individual Mr. Villar spoke to only had enough money for half a pound of methamphetamine. (Tr. 156:20–157:7, Jan. 17, 2012.) At 9:03 p.m., Mr. Villar tells Leo: "I'm here, so if you want to send Alex over here to the house." (Govt.'s Exh. 21 [Call No. 3939].) Leo agrees to send Alex, and Mr. Villar lets Leo know that "[t]his guy would be arriving in – in about fifteen minutes." (*Id.*) Leo says "[t]hat's fine. It's fine if they're there in about twenty minutes," to which Mr. Villar says "[a]ll right then." (*Id.*) The May 2, 2006 calls establish that Mr. Villar helped mediate the sale and delivery of methamphetamine to a third party by assisting in the negotiation of a certain quantity of methamphetamine between Leo and the third party and by voluntarily suggesting to Leo that he send Alex to his house with the drug within a certain time.

Finally, the last intercepted call, dated June 9, 2006, between Mr. Villar and Leo shows that Mr. Villar continued to facilitate methamphetamine deals between Leo and third parties. Mr. Villar tells Leo about a third party who wants "only four ounces." (Govt.'s Exh. 23 [Call No. 139].) Mr. Villar tells Leo that he plans to call the third party,

and Leo says "[t]ell him that right now it's at nine and a half, but there might be a better number in the near future." (*Id.*) Mr. Villar agrees: "Okay. All right. I'll tell him." (*Id.*) Consistent with the prior intercepted calls, Mr. Villar plays the role of a mediator between Leo and a customer in the sale and purchase of methamphetamine.

In sum, the intercepted calls involving Mr. Villar, Leo, and Alex from at least March 11, 2006 to June 9, 2006—together with the testimony of Detective Bosket, Agent Hammer, [redacted]—provide convincing evidence that Mr. Villar helped broker the sale of methamphetamine, supplied by Leo and delivered by Alex, to third-party customers. In other words, the intercepted calls involving Mr. Villar, Alex, and Leo between March and June 2006 establish beyond a reasonable doubt a nexus between Mr. Villar and the larger criminal partnership involving Leo [redacted] Alex, and others. *See United States v. Stauffer*, 922 F.2d 508, 514–15 (9th Cir. 1990) ("Once the existence of a conspiracy is proved, evidence establishing beyond a reasonable doubt defendant's connection with the conspiracy, even though the connection is 'slight,' is sufficient to convict defendant of knowing participation in the conspiracy.") The Court also separately finds that the March to May 2006 calls evidence Mr. Villar's brokering of one pound or 453.6 grams of methamphetamine at $9,500 in March 2006; one pound or 453.6 grams of methamphetamine at $10,500 on May 1, 2006; and a half of pound or 226.8 grams of methamphetamine on May 2, 2006. The Court thus finds Mr. Villar guilty of conspiracy to distribute at least 500 grams of methamphetamine pursuant to 21 U.S.C. § 841(b)(1)(A).

At trial, Mr. Villar testified and did not deny that he knew Leo to be dealing drugs, that the transactions referenced in the intercepted calls dealt with the sale of drugs, that he relayed messages to and from Leo and a third party regarding a certain price and quantity of drugs, or that it was his voice in the intercepted calls for which transcripts were admitted into evidence. Rather, Mr. Villar's primary defense is that the drug at issue was

not methamphetamine but cocaine and that he simply relayed certain messages involving cocaine from Leo to third parties out of a sense of financial obligation to Leo. Specifically, Mr. Villar testified that he met Leo around 2003, that his relationship with Leo revolved around playing soccer, and that Leo would assist him financially from time to time. (Tr. 5:11–25, Jan. 19, 2012.) Mr. Villar testified that around March 2006, Leo asked him to relay a message to an unnamed third party regarding whether that person would be interested in purchasing cocaine. (Tr. 9:12–10:10, Jan. 19, 2012.) Mr. Villar testified that he "finally ended up relaying the message to the third party only because [he] thought that it would free [him] from this burden of constantly being asked by Leo to relay the message to the third party." (Tr. 11:2–5, Jan. 19, 2012.) The Court acknowledges that Mr. Villar did not have the benefit of counsel at trial and that he assumed, albeit voluntarily, the formidable task of representing himself. However, even after conferring special leniency to Mr. Villar given his *pro per* status, Mr. Villar's explanation of his relationship and dealings with Leo are tenuous and simply not credible. Mr. Villar offers no corroborating evidence and did not controvert any of the evidence offered by the Government. Mr. Villar also did not directly address the intercepted calls from March to June 2006, which do not evidence any signs of duress or coercion by Leo. Significantly, Mr. Villar's story of the events simply stopped in March 2006 without any explanation of his conversations with Leo in May 2006. (Tr. 19:24–20:2, Jan. 19, 2012.) In cross examination, Mr. Villar admitted that he relayed messages to third parties from Leo regarding a certain price and quantity of a drug, and that he was talking to Leo about drugs—albeit cocaine—in the intercepted phone conversations. (Tr. 31:25–32:4, 33:6–35:16, 38:12–39:25, 41:2–42:17, Jan. 19, 2012.) Mr. Villar also admitted that Alex went over to his house to deliver drugs to a third party. (Tr. 40:8–13, 42:22–43:5, 44:15–45:10, Jan. 19, 2012.) Simply put, Mr. Villar's version of events was not credible and did not in any way cause the Court to question the overwhelming evidence offered by the

Government demonstrating that he knowingly participated in a plan to deliver a controlled substance in violation of 21 U.S.C. §§ 846 and 841(a)(1).[8]

**B. Count Ten – Use of a Communication Facility (21 U.S.C. § 843(b))**

Mr. Villar is also charged in Count Ten with use of a communication facility in committing a felony drug offense, in violation of 21 U.S.C. § 843(b). The Government alleges that on May 1, 2006, Mr. Villar knowingly or intentionally used a telephone to help bring about the conspiracy to distribute methamphetamine charged in Count One of the Indictment. (Indictment, at 71.)

**1. Legal Standard**

Section 843(b) provides that "[i]t shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter. . . . For purposes of this subsection, the term 'communication facility' means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication." 21 U.S.C. § 843(b). In order for Mr. Villar to be found guilty of violating section 843(b), the Government must prove beyond a reasonable doubt that Mr. Villar (1) knowingly or

---

[8] Even assuming that the drug at issue concerned cocaine, rather than methamphetamine, the charge of conspiracy to distribute a controlled substance does not specifically require that the Government prove that Mr. Villar conspired to distribute methamphetamine, only that he knew the drug was a "prohibited drug." Crim. Instr. 9.18. Mr. Villar admitted to knowing that cocaine is a prohibited drug or a controlled substance. (Tr. 15:15–19, Jan. 19, 2012.) Mr. Villar would therefore be guilty of conspiracy to distribute a controlled substance under 21 U.S.C. §§ 846, 841(a)(1), irrespective of whether the drug was methamphetamine or cocaine. *See United States v. Ramirez-Ramirez*, 875 F.2d 772, 774 (9th Cir. 1989) (stating that a defendant may be convicted under section 841 "if he believes he has *some* controlled substance").

intentionally used a communication facility (2) to help bring about the conspiracy to distribute methamphetamine. Criminal Instr. 9.29; *see also United States v. Adler*, 879 F.2d 491, 495 (9th Cir. 1988) ("In order to prove a violation of 21 U.S.C. § 843(b), the government must establish knowing and intentional use of a communications facility, e.g., a telephone, to facilitate the commission of [the] narcotics offense." (citations and quotes omitted)).

**2. Mr. Villar's Use of a Communication Facility**

The Government has proven beyond a reasonable doubt that Mr. Villar knowingly and intentionally used a telephone on four different occasions on May 1, 2006 to further the conspiracy to distribute methamphetamine under Count One. As discussed above, Mr. Villar deliberately used his cellular phone, with the number (626) 705-7450, which was subscribed under his name and address, to initiate and receive calls to and from Leo and Alex on May 1, 2006. Mr. Villar does not deny that he voluntarily used his cellular phone to converse with Leo and Alex. During these calls, Mr. Villar relayed messages to and from Leo and third-party customers regarding a certain quantity of methamphetamine for a certain price. Mr. Villar also used his phone to give directions to Alex to his apartment and facilitate the deliver of the drug from Leo to his customers.

///

///

## III. CONCLUSION

For the foregoing reasons, the Court finds Mr. Villar guilty on Count One for conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1) and Count Ten for use of a communication facility to further the conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 843(b). The Court separately finds that Mr. Villar conspired to distribute at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine and is subject to the penalty under 21 U.S.C. § 841(b)(1)(A).

DATED: January 30, 2012

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE